# EXHIBIT A

**Case Docket Entries**

CC-02-2024-C-324

| Court: | **Circuit** | County: | **02 - Berkeley** | Created Date: | **6/26/2024** | Security Level: **Public** |
|--------|------------|---------|-------------------|---------------|---------------|---------------------------|
| Judge: | **Michael Lorensen** | Case Type: **Civil** | | Case Sub-Type: **Tort** | | Status: **Open** |

Related Cases:

Style:   **Rose V Fisher v. Allstate Insurance Company**

| | Entered Date | Event | Ref. Code | Description |
|---|-------------|-------|-----------|-------------|
| 1 | 6/26/2024 12:34:35 PM | E-Filed | | Complaint |
| | 1-1  6/26/2024 | Civil Case Information Statement | | |
| | 1-2  6/26/2024 | Complaint - Complaint | | |
| | 1-3  6/26/2024 | Transmittal | | |
| | 1-4  6/26/2024 | Summons | | |
| 2 | 6/26/2024 12:34:35 PM | Judge Assigned | J-02006 | Michael Lorensen |
| 3 | 6/26/2024 12:34:35 PM | Party Added | P-001 | Rose V Fisher |
| 4 | 6/26/2024 12:34:35 PM | Party Added | P-002 | Mary Ann Fisher |
| 5 | 6/26/2024 12:34:35 PM | Party Added | D-001 | Allstate Insurance Company |
| 6 | 6/26/2024 12:34:35 PM | Attorney Listed | P-001 | A-10391 - George Nico Sidiropolis |
| 7 | 6/26/2024 12:34:35 PM | Attorney Listed | P-002 | A-10391 - George Nico Sidiropolis |
| 8 | 6/26/2024 12:34:35 PM | Service Requested | D-001 | Secretary of State - Certified - Including Copy Fee |
| 9 | 6/26/2024 2:03:02 PM | E-Docketed | | Supporting Documents - Summons Issued and Mailed Certified Mail, Return Receipt Requested, to West Virginia Secretary of State 06/26/2024 (Allstate Insurance Company) |
| | 9-1  6/26/2024 | Supporting Document - Summons Issued and Mailed Certified Mail, Return Receipt Requested, to West Virginia Secretary of State 06/26/2024 (Allstate Insurance Company) | | |
| | 9-2  6/26/2024 | Transmittal | | |
| 10 | 7/11/2024 12:58:11 PM | Scanned Document | | Supporting Document - SOS Invoice #620508 - Paid in June's Month End Closing |
| | 10-1  7/11/2024 | Supporting Document - SOS Invoice #620508 - Paid in June's Month End Closing | | |
| 11 | 7/11/2024 1:52:06 PM | E-Docketed | | Supporting Documents - Green Card - WV Secretary of State Process Division - signed by K. Bryant on 07/08/2024) |
| | 11-1  7/11/2024 | Supporting Document - Green Card - WV Secretary of State Process Division - signed by K. Bryant on 07/08/2024) | | |
| | 11-2  7/11/2024 | Transmittal | | |
| 12 | 7/19/2024 11:06:48 AM | Document Emailed | | Court user emailed kallen@kesnerlaw.com document 1-2 - Complaint - Complaint |

| User ID:  **Belinda.Parsons** | Page 1 of 1 | Date/Time:  **7/19/24 11:06 AM** |
|---|---|---|

E-FILED | 6/26/2024 12:34 PM
CC-02-2024-C-324
Berkeley County Circuit Clerk
Michelle R. Schoppert

## IN THE CIRCUIT COURT OF BERKELY COUNTY, WEST VIRGINIA

MARY ANN FISHER                    *
AND ROSE V. FISHER                 *
                                   *
        Plaintiffs,       *
                                   *
v.                                 *        Civil Action No.: _____
                                   *
ALLSTATE INSURANCE COMPANY         *        Judge: _____
                                   *
        Defendant.        *

---

## COMPLAINT

---

**NOW COMES**, Mary Ann Fisher and Rose Fisher, by and through their undersigned counsel, and for their Complaint against the defendant, Allstate Property and Casualty Insurance Company, state as follows:

1. The Plaintiffs, Mary Ann Fisher and Rose V. Fisher, are mother and daughter respectively and are residents of Kearneysville, Berkeley County, West Virginia.

2. Defendant, Allstate Insurance Company (hereinafter sometimes referred to as "Allstate" or "the Allstate Corporation"), is a foreign corporation licensed to conduct insurance business in the State of West Virginia and has a service of process address listed with the West Virginia Secretary of State of c/o CT Corporation System, 5098 Washington Street, W., Ste 407, Charleston, WV 25313 and with a principal office address of 3100 Sanders Rd. Ste. 201, Northbrook, IL 60062-7154.

3. The Circuit Court of Berkley County, West Virginia, has subject matter jurisdiction over the subject claims.

4.  The Circuit Court of Berkley County, West Virginia, may properly exercise jurisdiction over the parties to this action.

5.  The Circuit Court of Berkley County, West Virginia, is a proper venue for this action.

### Behind the Scenes at Allstate

6. Defendant Allstate sought to increase corporate wealth and corporate profitability and consulted with McKinsey and Company consulting firm in an effort to achieve this goal.

7. McKinsey is a management consulting firm that provides services to the majority of leading insurance carriers across North America, Europe and Asia.

8. McKinsey consulted with Allstate and advised that it needed to adopt a new vision of claims, one that seeks to reduce claims expenses by reducing claim payment to claimants thereby increasing corporate wealth.

9.  McKinsey gave Allstate advice at the strategic level.

10.      Thereafter, Allstate instituted its own tactical programs in accordance with McKinsey's management advice.

11.      McKinsey told Allstate it could wear down customers (policyholders like the plaintiff) by delaying settlement and stalling court proceedings.

12.      Feed litigators to alligators was the mantra that McKinsey taught Allstate.

13.      McKinsey taught Allstate that claims handling was a zero sum game.

14.      McKinsey taught Allstate that there were winners and losers and for Allstate to win, claimants had to lose.

2

15.     McKinsey's message to Allstate was that in order for Allstate to win it must pay out no more than it has to because the ultimate goal is to keep premium dollars and thereby increase the corporation's wealth.

16.     McKinsey suggests Allstate politely make a low offer on a claim.  If a policyholder protests or hires a lawyer, McKinsey told the insurer that it should fight back.  McKinsey told Allstate to put its good hands in boxing gloves.

17.     McKinsey explicitly told Allstate that its goal is a reduction of 5 to 15 percent in severities (claim payment). McKinsey refers to this opportunity to reduce severity as eliminating economic leakage (what it considers claim overpayment).

18.     McKinsey has a questionnaire that will be used in the Closed File Survey.  There is a pre-existing assumption that claims have been overpaid, and the survey form creates a hindsight bias for the participants to provide a "Summary of Overpayment by Phase of Claim Process", which suggests, somewhat conclusively, that there is overpayment to be summarized. But there are bumps along the way: initially, very little opportunity (overpayment} is identified, then in short order, it is not only identified, but found across the claims process. Opportunity is in the eye of the beholder, or shareholder as the case may be.

19.     Allstate adopted McKinsey's business model.

20.     Allstate has not repudiated McKinsey's business model or instructed its manager to forget their CCPR training.

21. Allstate has not instructed its adjusters to forget their CCPR training.

22. Allstate's managers and adjusters rely upon their CCPR training for claims handling.

23. McKinsey's goal is to change the corporate culture so that its redesign will permanently change the corporation's claims practices and procedures.

24. Allstate's chief executive, Jerry Choate in the National Underwriter in 1997 indicates: "The property-casualty companies that are positioned to "win" over the long term are those that focus on the claims side of the business … Allstate is sticking with its agency force and expanding it, as management directs its attention to claims practices. … "the leverage is really on the claims side" he said, noting that three out of every four dollars that go out of an insurance company "go out the claims door." "If you don't win there. I don't care what you do on the front end. You're not going to win," he said.

25. This is not a new idea for Allstate. Allstate acknowledges that it sees claims as crucial to profits since 1997. Allstate Sees Claims as Crucial to Profits National Underwriter (3/31/97).

26. The McKinsey engagement indicates, "[o]ur goal is to redefine the game … to question, improve and radically alter our whole approach to the business of claims." CCPR Implementation Training Manual – Tort States (7/95).

27. McKinsey defines the "Goals of Redesign" as moving from "… a suspicion that increases in severities could not be managed and were "the cost

4

of doing business" to "… an understanding that we can and should manage specific components of severity to provide a greater financial support to the company." CCPR Implementation Training Manual – Tort States (7/95).

28. At the McKinsey – Allstate initial engagement meeting, hand written notes reveal: "We won't get the full 12% in economic opportunity – most companies get half 7% is Five Hundred Billion Dollars ($500,000,000,000)." A few pages earlier it says to refer to leakage as opportunity. Allstate's McKinsey was to generate an additional Five Hundred Billion Dollars for the corporation by reducing claim payment.

29. Among the tactical programs Allstate implemented was the use of claim assessment software known as Colossus.

30. Colossus is the trade name for a software program owned by Computer Science Corporation (CSC), and licensed to individual insurers for use in evaluating bodily injury claims.

31. Colossus is a severity tool, it's not a consistency tool. When Colossus was initially marketed, Continuum, and later CSC, touted the "savings" that could be achieved by using Colossus to reduce indemnity payouts. But as the inevitable firestorm of litigation erupted, insurance companies became sensitive about the "s-word", as it suggests that Colossus can be used to generate a new, lower value that saves money over the value that the company would have paid historically using traditional methods to place a value on a claim. As a result, in 2003 CSC decided to introduce "consistency" as a substitute synonym for "savings". Nonetheless, the behind-the-scenes correspondence at Allstate and

5

the presentations made by Allstate to the investment community in the previous decade make it clear that the product was primarily intended to deliver a severity reduction.

32.	The purpose of Colossus is to systematically reduce claim payment by removing all individuality of a claim and simply break the claim down into factors which will be evaluated identically regardless of the insurer, the adjustor, or the claimant.

33.	Ken Williams, President of America's Division of CSC's Financial Services Group noted, "Colossus takes the guess work out of an historically subjective segment of the claims process, providing adjustors with a powerful tool for improving claims valuation consistency, increasing productivity and containing costs. Colossus sets the industry standard by basing pain and suffering evaluations on the severity of actual injuries and provides claims professionals with a valuation range for each claim."

34.	According to the original programmers, Colossus was set up to calculate general/non-economic damages based upon the following four general categories:

a. Trauma (including all factors on diagnosis, prognosis, treatment, duration of symptoms, etc.)

b. Permanent Impairment

c. Disability (later changed to Duties Under Duress)

d. Loss of Enjoyment of Life

6

35.     These general categories are broken down into approximately 600 injuries and 10,000 factors, which can range from the number of days in a hospital to the type of immobilization device used.

36.     In general, factors are provided value based upon the duration of symptoms, the type of treatments received, the frequency and duration of treatment, and the complications arising from the injuries.

37.     Colossus evaluates claims based upon a severity scale by providing "weight" to certain injuries and factors in the form of "severity points." While some insurers have customized versions of Colossus, the number of severity points is apparently the same for every version of Colossus when it is delivered to insurers.

38.     A CSC executive previously testified that Colossus does not come with any set monetary values for the factors, and that the program's monetary range for the settlement offers is solely based upon the information fed into the systems by the insurer. *Scroghan v. Wade and Allstate Ins. Co.,* Bartholomew Circuit Court, State of Indiana, Case No. 03C01-9909-CT-1317 Testimony of Steve Hancock, Director of Financial Services Group at CSC.

39.     The insurer sets the amount of money that will be allocated per severity point in something called "benchmark tuning." With some major insurers, the benchmark tuning session consisted of the company's top 20-40 adjustors in a geographical region getting together to evaluate approximately 11 cases total.

40.     Once a consensus was reached by the adjustors as to a claim's value, the decision would be recorded.5 From that small amount of information, the insurer would extract the market value of all 10,000 factors in Colossus.

41.     Some companies then took the values provided by their top adjustors and cut them before creating the Colossus baseline. In doing so, the insurer knowingly pays claimants less than the claim's worth as determined by the company's most conservative adjustors. According to former adjustors involved in the initial implementation of Colossus, some insurance companies arbitrarily cut the value of all claims by a percentage (ranging from 5-20%) from the values provided by their best adjustors. Robert Dietz & Christine Klein at *WSTLA CLE The Rise of Colossus*, November 22, 2002; James Mathis at *WSTLA CLE The Rise of Colossus*, November 22, 2002; Declaration of Robert Dietz, No. 1, *Farmers Insurance Exchange v. Robert Dietz & Christine Klein*, Superior Court of the State of Washington for Snohomish County, Case 02 2 10109 5 (2002).

42.     This meant that these insurers knowingly underpaid UM/UIM claims by that percentage. Robert Dietz & Christine Klein at *WSTLA CLE The Rise of Colossus*, November 22, 2002; James Mathis at *WSTLA CLE The Rise of Colossus*, November 22, 2002; and Declaration of Robert Dietz, No. 1, *Farmers Insurance Exchange v. Robert Dietz & Christine Klein*, Superior Court of the State of Washington for Snohomish County, Case 02 2 10109 5 (2002).

43.     Another significant problem resulted when some major insurers originally tuned Colossus: they intentionally excluded all cases which were "clear policy limits cases," all cases worth more than $50,000, all stacking UM/UIM

policies and all litigation cases. Robert Dietz & Christine Klein at *WSTLA CLE The Rise of Colossus*, November 22, 2002; James Mathis at *WSTLA CLE The Rise of Colossus*, November 22, 2002; Guidera, Jr. *Colossus at the Accident Scene: Software of Insurers Spurs Suits – Insurers Use Program to Calculate Payout for Injuries, But Many Claim It Is Misused*, The Wall Street Journal, January 2, 2002.

44.     Some insurers excluded all claims where there were "external factors" such as excessive speed, drunk driving, hit and run, etc., from the baseline. The exclusion of all high claims likely resulted in a baseline value notably lower than the insurer's actual baseline.

45.     From this baseline, claim value is then calculated by Colossus based upon the claim factors.

46.     The program provides a "Colossus High" and a "Colossus Low" value for the adjustor.

47.     At Allstate, the Evaluation Consultant has the unenviable task of being the live person charged with rubber-stamping and enforcing the Colossus value while generating a veneer of independent, human judgment. As such, her participation is designed to insulate Allstate from bad faith claims. In reality, the Evaluation Consultant is there to make sure that adjusters understand that they should buy into the Colossus values and then sell them to the claimant. The Evaluated Amount and the Colossus High are tracked in an EC Log, and it's remarkable how the independent, human judgment of the Evaluation Consultant so frequently agrees precisely with the Colossus recommendation

9

very rarely finding any additional value whatsoever to the circumstances Colossus is not designed to consider.

48.    Colossus does not accurately reflect fair payment levels in the marketplace. At Allstate, Colossus was tuned to generate savings of 15% over what had been paid historically. The tuning manuals make it clear that the adjusters participating in the tuning are to assign conservative compromise settlement values to the tuning cases - not verdict value. The tuning values arrived at for the canned scenarios in the base tuning are just a starting point, the company then compares the results of that tuning to the actual payments in sample of closed files and makes further adjustments to the conservative tuning derived from the values placed on the canned scenarios.

49.    In New Mexico, the conservative values assigned by the adjusters resulted in a 4% savings when applied to the closed file sample. Allstate decided to override that tuning and crank the savings down to the full 15% savings that the claims department promised to deliver to the company. The tuning acknowledgement documents make it clear that CSC is emphatically laying responsibility for the tuning values at Allstate's feet; the indemnity flows from Allstate to CSC for any claims that result from the ensuing low-balling.

50.    The annual re-tuning of Colossus results in small incremental changes to the tuning (O - 2%) at the discretion of the company, with no connection to the medical consumer price index or any other real world factor other than the carrier's ability to hold the line on the previous year's tuning. If

10

claim values in your community appear to be slowly deteriorating in comparison to medical specials, it's because they are.

51.    Colossus considers all factors relevant to evaluating general damages. By assigning dollar values to eight canned scenarios with pre-determined severity points, eight data points are created which can be connected to form a curve. All future claims evaluated using Colossus will take a very limited set of mostly medical data, and use that input to calculate a number of severity points, and that number will fall somewhere along that curve between two of the original eight points, and accordingly be converted to dollars.

52.    A computer can't feel your pain. Nor can any adjuster, juror, or judge understand the pain and suffering, frustration, anger, sadness, anxiety, or worry subjectively experienced by a claimant by having his or her work, health, recreation, finances and interpersonal relationships disrupted by an injury -- by simply looking at the diagnostic codes, treatment codes and number of visits to the doctor.

53.    At Allstate, Colossus is re-tuned annually, and that tuning is used to generate a planned severity for a particular market.

54.    The Market Claim Manager reviews and negotiates with the region the annual Severity Plan which must be met for him to achieve his bonus, which is a significant portion of his pay.

55.    Adjusters settle claims, Evaluation Consultants provided Evaluated Amounts, and Colossus provides recommendations.

11

56.    A measure of the Allstate adjuster's performance is how closely the adjuster is able to resolve the claim in relation to the Evaluated Amount provided by the Evaluation Consultant.

57.    The Evaluation Consultant ("EC") is rated on how closely the EC's Evaluated Amounts track the Colossus High.

58.    The amount typically offered to settle claims will closely track the Colossus amount if the adjuster and EC would like to keep their jobs.

59.    By treating more claims as Minor Impact Soft Tissue (MIST) claims or Special Investigative Unit (SIU) claims, Allstate's overall severity has been reduced by denying or only nominally paying a much larger percentage of its claim volume.

60.    Allstate historically hasn't used Colossus in MIST and SIU cases. In the approximately 50% of its claim volume where Colossus is used, Colossus is the sole identifiable reason for the "savings".

61.    Allstate, McKinsey and CSC thoroughly evaluated and projected the "savings" benefit attributable to Colossus before it was ever licensed. The 15% savings over historical payment amounts back in 1995 is still in effect.

62.    That number has increased over time due to the fact that the incremental annual tuning changes have not kept up with inflation.

63.    Allstate has continued to tout its competitive advantage over the industry in combined ratio.

64.    Allstate's use of Colossus is for the purpose of increasing shareholder value.  Before Colossus was licensed as a part of CCPR, Allstate's

12

combined ratio was targeted at 104.9 for 1992, with a goal of 103.9 for 1996. Allstate's combined ratio for bodily injury dropped dramatically following the rollout of CCPR and Colossus. By 2006, for the Western Star Region, the planned combined ratio was 87.1, and Allstate was beating that number by 7 points early in the year. That means that instead of reducing premiums to maintain a combined ratio of about 100 or more, Allstate was content to plan to generate an underwriting profit of about 13%, at the expense of claimants, which it then passed along to its primary customer, the shareholder.

65.    Many of the Allstate executives at the helm for the design and implementation of CCPR profited enormously from the program.

## The Insurance Claim

66.    At all times material and relevant, plaintiffs Mary Ann Fisher and Rose V. Fisher, were covered by a policy of insurance issued to the Fisher family by Allstate.

67.    The subject policy of insurance was issued by Allstate Property and Casualty Insurance Company ("Allstate") and bore policy number 998 758 032 (hereinafter sometimes referred to as "subject policy").

68.    On or about November 12, 2018, the plaintiffs suffered a covered loss under the subject policy.

69.    Plaintiffs substantially complied with all requirements and policy provisions of said Allstate automobile insurance policy.

70.    On or about November 12, 2018, an automobile accident occurred involving a vehicle owned and operated by Michael Skaggs, at the intersection of

13

Foxcroft A venue and Apple Harvest Drive in Martinsburg, Berkeley County, West Virginia.

71.     Plaintiff Mary Ann Fisher was a restrained driver of a 2019 Ford Taurus traveling straight on Foxcroft A venue through the intersection with Apple Harvest Drive to a McDonalds when her car was hit in a T-bone style collision by a 1989 Chevrolet GMT400 pickup truck being driven by Michael Skaggs.

72.     The tortfeasor, Michael Skaggs was traveling east at a high rate of speed on Apple Harvest Drive when he failed to stop for the red light.

73.     Plaintiff Mary Ann Fisher was three-quarters of the way through the intersection when Mr. Skaggs hit her vehicle with great force sending his truck to rest on the railroad tracks and spinning her car around so that it was now facing in the opposite direction.

74.     Senior Trooper A.D. Gough of the West Virginia State Police investigated the accident.

75.     Mr. Skaggs was cited for failure to stop at a traffic signal and no proof of insurance by investigating law enforcement.

76.     This citation is documented on the State of West Virginia Uniform Traffic Crash Report.

77.     Mr. Skaggs pied guilty to failure to stop at a traffic signal in Berkeley County Magistrate Court.

78.     At the time and place aforesaid, it was the duty of the vehicle's operator, Michael P. Skaggs, to operate the 1989 Chevrolet GMT400 pickup truck with reasonable care and with due regard for others using the road.

79.     Notwithstanding said duties, the vehicle's operator, Michael P. Skaggs, did then and there, so recklessly and negligently operate the 1989 Chevrolet GMT 400 pickup truck with such disregard, that he caused it to strike the vehicle that the Plaintiff was driving with great force.

80.     The vehicle's operator, Michael P. Skaggs was negligent in the operation of the 1989 Chevrolet GMT 400 pickup truck in that he:

a. Failed to maintain control of the vehicle;
b. Failed to operate the vehicle in such a manner as to avoid a collision with the person or property of others;
c. Failed to obey traffic laws;
d. Operated the vehicle in a reckless fashion without regard for the safety of others;
e. Failed to give full attention and time to the operation of the vehicle; and Complaint

f. Otherwise was generally negligent.

81.     As a direct and proximate result of the reckless and negligent actions of Michael P. Skaggs, as aforesaid, the Plaintiffs Mary Ann Fisher and Rose V. Fisher, were caused to be injured in or about their bodies, body chemistries, and psyches.

82.     That as a direct and proximate result of the reckless and negligent actions of the Defendant Michael P. Skaggs, as aforesaid, the Plaintiffs, Mary Ann Fisher and Rosie Fisher, have incurred diverse and sundry expenses for their healthcare in excess of $25,000.00 each, thus far.

15

83.    As a direct and proximate result of the reckless and negligent actions of the Defendant, as aforesaid, the Plaintiffs have suffered substantial injuries and will likely incur future medical treatment, future pain and suffering, etc.

84.    Further, the Plaintiffs endured past pain and suffering, annoyance, aggravation, duress and inconvenience.

85.    Shortly after November 12, 2018, Allstate became aware of the motor vehicle crash hereinbefore described and the claims of Plaintiff Renner.

86.    Following the November 12, 2018, motor vehicle crash and before and after the eventual settlement of the bodily injury claim with the tortfeasor's insurance carrier, Plaintiff was wrongfully denied available underinsured motorist bodily insurance policy benefits under the policy of insurance by Allstate.

87.    Allstate also insured the tortfeasor and received regarding the claims of the plaintiffs by letter dated December 7, 2018.

88.    On December 18, 2020, Allstate filed a Complaint for Interpleader against Mary Ann Fisher, Rose Fisher, William Daigre (the passenger in the tortfeasor's vehicle), and the Center of Medicare Services and Anthem Health Plans of Virginia, Inc.

89.    Allstate issued a policy of automobile insurance to Michael Skaggs, policy number 000998384866, which was in effect on November 12, 2018. The policy contained bodily injury liability coverage which, subject to the terms and conditions of the policy, had limits of $25,000.00 (Twenty-Five Thousand

Dollars) for each person and $50,000.00 (Fifty Thousand Dollars) for each accident.

90.    Allstate knew that the total amount of $50,000.00 (Fifty Thousand Dollars) was inadequate to fully and completely compensate Mary Ann Fisher and Rose Fisher for their injuries.

91.    In fact, the Complaint for Interpleader plainly states, "Claims submitted to Allstate on behalf of Mary Ann and Rose Fisher assert that Mary Ann Fisher has incurred medical expenses in excess of $25,065.08 and that Rose Fisher has incurred medical expenses in excess of $20,537.65."

92.    Allstate acted by and through its agents, adjusters and managers it employed to handle, investigate, adjust and defend the first-party underinsured motorist bodily injury claims of Plaintiffs, and many of the negotiations, investigation of the claim and the defense of the same occurred in the State of West Virginia.

93.    As a direct and proximate result of the wrongful denial of multiple settlement demands within the underinsured motorist bodily injury policy limits under the applicable automobile insurance policy, Plaintiff was caused to sustain injuries, damages, and other losses including, but not limited to: (a) attorneys fees; (b) costs; and (c) expenses.

94.    Following the settlement with the tortfeasor's insurance carrier, Plaintiff by and through their attorneys, advised Allstate that their claims for underinsured motorist coverage benefits exceeded all offers of settlement by

17

Allstate and implored Allstate to reconsider its zero dollar ($0) valuation of the plaintiff's claim.

95.     Allstate refused to value the plaintiffs claims at more than zero dollars ($0) for many years.

96.     Allstate spent considerable sums of money defending the plaintiffs' claims without making any offer to settle the plaintiffs' claims.  This included paying defense counsel and hiring multiple expert witnesses to testify that the plaintiffs suffered no injury of any kind in the subject motor vehicle crash.

97.     Plaintiffs, by and through their attorneys, demanded any undisputed policy proceeds and were wrongfully denied by Allstate any policy proceeds.

98.     Because of Allstate's refusal and failure to timely settle Plaintiffs' claims for underinsured motorist bodily injury policy proceeds, Plaintiffs were required to employ the services of attorneys to litigate Berkley County, West Virginia Civil Action No. 20-C-269 in order to establish the full amount of their damages.

99.     Allstate knew that Plaintiffs' claims for underinsured motorist bodily injury policy proceeds had a value far in excess of their zero dollar ($0) valuation, but wrongfully failed to increase its initial settlement offer or adjust the claim in good faith and in accordance with West Virginia law.

100.   At all times relevant herein, Allstate and its agents, adjusters, managers and employees were required to obey a code of conduct regarding the appropriate conducting of insurance business, including the good faith adjustment of claims,

common law of first party insurance company claim conduct, the West Virginia Unfair Trade Practices Act, W. Va. Code §33-11-4, and the West Virginia Insurance Regulations, in the handling, investigating, adjusting and settling of Plaintiff's first-party claim for underinsured motorists bodily injury insurance benefits.

101.   Insurance is a risk transfer device.

102.   The insured pays a premium, and an insurer assumes the risk of something bad happening.

103.   The risk of loss or some part of that risk is transferred to the insurance company.  The process works by the combining of homogeneous units, the same type of exposure units, and the application of the law of large numbers. Unpredictable individual losses become collectively predictable.

104.   When an insured pays a premium into a pool of funds, the insurance company uses actuarial science to predict frequency and severity of loss. Frequency is the number of losses, usually expressed as a number per thousand policies.  Severity is how much the average loss will cost.

105.   People place great importance on their health and property, so they buy insurance to minimize the economic impact of accidents and losses.

106.   The premium pays for a conditional promise to pay if loss occurs that is covered by the policy.  During any given policy period, most insureds receive only peace of mind for their premium dollars, while the few that suffer a covered loss typically receive significantly more than the premium paid.

107.   Most insurance contracts are offered to the insured on a take it or leave it basis; they are written by the insurer without input from the insured.

108.   An insurer owes the insured a duty of good faith and fair dealing separate from the duties under the insurance contract and those arising from statute, regulation, or case law.

109.   The insurer's duty of good faith and fair dealing is affirmative and unconditional.   Internal claim guidelines usually acknowledge this and give guidance on how to deliver the required level of service.

110.   In one form or another, most states have enacted statutes, regulations, or supervision that governs claim-handling practices.

111.   These claims practices standards impose certain duties and obligations on an insurer in the handling of a first-party claim.

112.   While statutes, regulations, or other standards set outlines for good claim handling, they do not completely define the parameters required for every specific situation; that requires internal standards of fairness by the insurer.

113.   The National Association of Insurance Commissioners created a Model Unfair Claims Practices Act that provides statutory and regulatory standards for the handling of insurance claims.

114.   These represent a codification of well-established insurance industry standards.   Over 45 states have adopted the Model Unfair Claims Practices Act, either in part or in its original form.

115.    West Virginia's Code (Chapter 13) enumerates fifteen actions by insurance companies that amount to unfair claim settlement practices.   These items include, but are not limited to:

**(9)** *Unfair claim settlement practices.* **-- No person shall commit or perform with such frequency as to indicate a general business practice any of the following:**

(a)  Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
(b)  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
(c)  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(d)  Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(e)  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(f)  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
(g)  Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;
(h)  Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;
(i)  Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured;
(j)  Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;
(k)  Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(l)  Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(m)  Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(n)  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

116.    Further, West Virginia Legislative Rule, Insurance Commissioner, **SERIES 14 defines UNFAIR TRADE PRACTICES (114CRS14)** that includes:

**§114-14-3. File And Record Documentation**.

The insurer's claim files shall be subject to examination by the Commissioner or by his or her duly appointed designees. Such files shall contain all notes and work papers pertaining to the claim in such detail that pertinent events and the dates of such events can be reconstructed. All communications and transactions emanating from or received by the insurer shall be dated by the insurer. A notation of the substance and date of all oral communications shall be contained in the claim file. Insurers shall either make a notation in the file or retain a copy of all forms mailed to claimants.

117.    **§114-14-5. Standards For The Acknowledgment Of Pertinent Communications**

5.3. Replies to other pertinent communications. –

A reply shall be made within fifteen (15) working days of receipt by the insurer to all other pertinent communications from a claimant which reasonably suggest that a response is expected. 5.4. Provisions of assistance to first-party claimants. -- Every insurer, upon receiving notification of a claim, shall promptly provide necessary claim forms, instructions, and reasonable assistance so that first-party claimants can comply with the policy conditions and the insurer's reasonable requirements. Compliance

with this subsection within fifteen (15) working days of notification of a claim constitutes compliance with subsection 5.1. of this section.

**§114-14-6. Standards For Prompt Investigations And Fair And Equitable Settlements Applicable To All Insurers.**

6.1. Investigation of claims. –

Every insurer shall promptly conduct and diligently pursue a thorough, fair and objective investigation and may not unreasonably delay resolution by persisting in seeking information not reasonably required for or material to the resolution of a claim dispute. This section is not intended to conflict with the statutory requirements of the Medical Professional Liability Act, W. Va. Code §§55-7B-1 to 11, as the same relate to the assertion and investigation of medical professional liability claims.

6.3. Duty after investigation. –

Within ten (10) working days of completing its investigation, the insurer shall deny the claim in writing or make a written offer, subject to policy limits and, with respect to medical professional liability claims, subject to applicable statutory requirements set forth in the Medical Professional Liability Act, W. Va. Code §§55-7B-1 to 11.

6.4. Offers of settlement. –

a. In any case where there is no dispute as to coverage and liability, it is the duty of every insurer to offer claimants or their authorized representatives, amounts which are fair and reasonable, as shown by the insurer's investigation of the claim, providing the amounts so offered are within policy limits and in accordance with the policy provisions.

b. No insurer may attempt to settle a claim by making a settlement offer that is unreasonably low. The Commissioner shall consider any evidence offered regarding the following factors in determining whether a settlement offer is unreasonably low:

> 1. The extent to which the insurer considered evidence submitted by the claimant to support the value of the claim;

23

2. The extent to which the insurer considered legal authority or evidence made known to it or reasonably available;

3. The extent to which the insurer considered the advice of its claims adjuster as to the amount of damages;

4. The extent to which the insurer considered the opinions of independent experts;

5. The procedures used by the insurer in determining the dollar amount of property damage;

6. The extent to which the insurer considered the probable liability of the insured and the likely jury verdict or other final determination of the matter; and

7. Any other credible evidence presented to the Commissioner that demonstrates that the final amount offered in settlement of the claim by the insurer is or is not below the amount that a reasonable person would have offered in settlement of the claim after taking into consideration the relevant facts and circumstances at the time the offer was made.

These regulations impose certain duties and obligations on an insurer in the handling of claims consistent with the claims handling standards cited above.

118.  Profit is properly addressed and the responsibility of other departments of an insurer.  This would include such departments as sales, marketing, underwriting, and others.  Within the insurance industry, it customarily has been considered inappropriate for claims to be responsible in any way for profit.  After all, a department whose responsibility is to assist their insureds in obtaining all benefits available under the policy, cannot fulfill this obligation in good faith if there is incentives or pressure to pay less.

119.  The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), summarizes the required good faith claim handling that needed to take place in this claim when it states; "When a policyholder submits a claim

24

to an insurance company, he or she does so on the belief that the matter in question is covered by the policy.  Yet, policyholders generally do not understand all of the circumstances that are or are not covered in the policy and are not familiar with every provision in the policy affecting the amount they can recover." (p59)

120.    Allstate knows that undermining first party policy benefits carry the risk of increasing the insured's emotional and financial distress.

121.    With such knowledge, the public should expect Allstate to implement and enforce claim principles to carry out the policy's purposes with a high degree of skill, supervision, and concern for the insured.

122.    Regardless of title, whether it is; claims examiner, claims specialist, SIU investigator, contractor, or attorney; the person conducting/accomplishing the above tasks is considered by the industry as a claim handler.

123.    All claim handlers are required to meet industry standards, act in good faith, treat the insured fairly and give equal consideration to the interests of the insured.

124.    The AIC textbook, "The Claims Environment" (Markham, First Edition, 1993), details the role of the claim handler, commonly referred to as the "adjuster". The text explains that the claim adjustment process begins with the assignment of a claim to a claim representative.

125.    The following are four tasks the claim representative must accomplish:


a Investigation

b. Evaluation of coverage, liability, and damages

c. Negotiation or alternate dispute resolution (ADR) to achieve settlements

25

d. If necessary, litigation management (P. 9)

126.    When an insured purchases insurance, part of what he pays for is a reasonable and even-handed investigation.

127.    This is central to proper claim handling and is clearly detailed in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p27) where it states, "In a claim adjustment process, the claim is investigated, coverage and liability are determined, damages are measured, and if necessary, the claim is litigated. These tasks are carried out either by staff employees of the insurance company or by outside claim – adjusting services. Professionals and specialists in various fields, as well as fellow employees in the insurance company, also lend their support to the process."

128.    Industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law.

129.    The insurance industry and Progressive have long recognized that Uninsured (UM) and Underinsured Motorist (UIM) claims are first party claims.

130.    All of the obligations that are required in the handling of first party claims apply to UM/UIM claims.

131.    An insurance company has a duty to perform a full, fair and reasonable investigation of a UM claim, the investigation must be thorough and objective, and that in the investigation, an adjustor is required to look for reasons to support payment of the claim.

132.    An insurer must give equal consideration to the insured's interests

26

133.    If the insurance company learns of additional facts during its investigation that support paying a claim, the company has to investigate those additional facts, and if appropriate, re-evaluate the claim, they cannot ignore facts.

134.    First party claims cannot be denied or a reduced offer made on speculation or guesswork, the claims decision must be based on facts.

135.    When conducting an investigation of a claim, whether coverage or damages, the claim handlers are not just investigating on behalf of State Farm, but also on behalf of the policyholder.

136.    Decisions regarding coverage or liability are determined based on objective facts, gathered through a thorough and impartial investigation, giving equal weight to the evidence that supports coverage.

137.    It is the insurer which has control over the investigation, evaluation, processing, and denial of a claim.

138.    First party claims cannot be denied or a reduced offer made on speculation or guesswork, the claims decision must be based on facts.

139.    The insurance company cannot unreasonably offer less than is owed on any first party claim.  This includes "lowball" offers on UM and UIM claims.

140.    The insurance company cannot unreasonably force an insured claimant to litigate or arbitrate in order to obtain benefits.

141.    Insurance adjustors are not allowed to have a conflict of interest that would sway their decisions one way or the other when they are adjusting a claim.

142.    Insurance adjustors are required to know and be compliance with those laws and regulations that impact claims to the appropriate state, and treat all insureds consistent with requirements of the law.

143.    UM/UIM coverage has the fundamental purpose to protect the injured insured from the economic consequences of an accident caused by someone without adequate means to pay for the damages.

144.    Allstate promised to pay the sums recoverable, that is the verdict value, of the claim so the insured doesn't have to sue or fight for the money.

145.    The essential purpose of UM/UIM coverage is to put the insured in the same position as if the at-fault driver had adequate coverage and/or financial health to pay for all of the damages a jury would award the insured for the accident and injury.

146.    UM/UIM coverage is a first party coverage and design to fully compensate the insured, up to policy limits, so that the insured does not have to go through the laborious process of taking the at fault driver to trial.

147.    Allstate did not handle the claim in a way that would fulfill these purposes.

148.    Allstate resisted the claim, failed to fairly investigate, failed to reasonably evaluate all damages the insured is legally entitled to collect from the at-fault driver, driving the insured to file suit, litigate and prepare for trial to secure owed benefits.

149.    Allstate and the industry recognize that the value of an accident/injury claim is determined by how the accident and injury had impacted a person's life.  This is the basis of the injury investigation.

150.    In determining how the accident and injury has impacted the insured's life, a claim handler needs to determine; all of the injuries suffered in the accident, the pain and suffering caused by those injuries, and how those injuries and the accident have impacted the insured's life and insured's ability to lead their normal pre-accident life.

151.    Because this is a first party claim undocumented assumptions, conjecture and speculation are never reasonable excuses to prolong the investigation or reduce the evaluation.

152.    Allstate and their claim handlers elected not to use any of the tools provided by the policy to investigate the injury claim of their insured.  Instead, Allstate simply relied on the medical bills and records to evaluate the claim.

153.    This failure to investigate resulted in an unreasonable evaluation of the claim, delaying a reasonable settlement.

154.    The AIC 33 textbook, "Aggressive Good Faith and Successful Claims Handling" (Rokes, First Edition, 1987) discusses the failure to conduct a proper investigation and states:

> Where the insurer fails to investigate the case properly, however, there is no question that the insurer is in breach of contract. Further, there is no question that the insurer has been negligent by omitting to conduct a proper investigation, one of the responsibilities under the contract.  The right to recover for breach of contract or for the tort of negligence would seem to be apparent.  Whether the failure to investigate constitutes an extraordinary showing of disingenuous or dishonest failure to carry out a contract is certainly a question of fact.  It certainly demonstrates the existence of a nebulous threshold between negligence and what is considered to be "bad faith."

155.    Allstate and their claim handlers placed unreasonable roadblocks in the claim process.

156.    In any event, because a UIM claim is a first party claim, the claim handler has the obligation to be honest and open with the insured and reveal how the information/documentation was considered.

157.    As the AIC textbook, "The Claims Environment" states, "The insured should be able to trust the insurance company's claim representative. The claim

representative must follow through with promises and be completely honest with the insured." (Markham at 18)

158.    At no point in the claim investigation did Allstate provide any information regarding how information and documentation was considered.

159.    In fact, Allstate took the position that the plaintiffs' counsel was prohibited from sending letters directly to Allstate and that all communications must be made through Allstate's counsel.

160.    Allstate's claims handling way beyond all bounds of decency.

161.    Allstate misused the Rule 35 examinations of the plaintiffs, delayed presenting the Rule 35 physicians for depositions, and used the Rule 35 examinations to punish the plaintiffs for filing their claim for insurance benefits.

162.    For example, Allstate forced plaintiff Rose Fisher to travel from her home in Berkley County, West Virginia to Pittsburgh, Pennsylvania when other competent physicians were available to perform a Rule 35 examination in the vicinity of Rose Fisher's residence.

163.    Allstate abused the discovery process by providing incomplete answers to discovery, attempting to withhold photographic evidence of the crash, making unverified answers, refusing to provide a factual basis for Allstate's baseless representation that it "anticipates that it may assert the defense that the plaintiff's have failed to mitigate damages," and refusing to provide any evidence to support frivolous defenses of assumption of risk, contributory negligence, comparative negligence, negligence of others, failure to state a claim upon which relief can be granted and failure to join a party under Rule 19.

30

164.    Allstate maintained frivolous defenses to the plaintiffs' Complaint. These frivolous defenses included that the plaintiffs have failed to mitigate damages, assumption of risk, contributory negligence, comparative negligence, negligence of others, failure to state a claim upon which relief can be granted, and failure to join a party under Rule 19.

165.    Plaintiffs' requested that Allstate set forth its basis in law and fact for its valuation of its policyholder's claim.  Allstate ignored this request.

166.    Plaintiffs' requested that Allstate advise to what extent it values the Fishers' claims for prior medical expenses and past pain and suffering.  Allstate ignored this request.

167.    Plaintiffs' requested that Allstate advise whether Allstate has determined that Rose and/or Mary Ann Fisher had suffered a permanent injury. Allstate ignored this request.

168.    Plaintiffs' requested that Allstate setforth its factual basis for its determination whether or not Allstate believes that a jury will assess future medical care, loss of future earning capacity, future emotional suffering, and future loss of enjoyment of life. Allstate ignored this request.

169.    The plaintiffs advised Allstate that they were concerned by Allstate's ongoing "Strategy to Increase Shareholder Value" at the expense of its own insureds.  Allstate discussed its strategy of reducing claim payment to increase corporate wealth by "modifying claims operating processes to manage loss costs." Fourth Quarter 2022 Earnings Presentation at page 2.  A comparable strategy was articulated in Allstate Fourth Quarter Earnings Presentation in 2021 at page

31

8 ("Executing claims operating actions to manage loss costs").  Allstate ignored this pertinent communication.

170.    Again, profit is properly addressed and the responsibility of other departments of an insurer.  This would include such departments as sales, marketing, underwriting, and others.  Within the insurance industry, it customarily has been considered inappropriate for claims to be responsible in any way for profit.  After all, a department whose responsibility is to assist their insureds in obtaining all benefits available under the policy, cannot fulfill this obligation in good faith if the corporation's stated goal is to pay less to increase its stockholder's wealth.

171.    Allstate ignored the expert opinion of plaintiff Rose Fisher's treating neurosurgeons, including the opinion of Ezriel Kornel, MD, Brian and Spine Surgeons of New York.

172.    Allstate made a low-ball offer of Sixty-Thousand ($60,000) in exchange "for a complete release of all claims" to settle Rose Fisher's claim for Underinsured Motorist (UIM) coverage.

173.    Allstate made a low-ball offer of Seventy-Two Thousand ($72,000) in exchange "for  a complete release of all claims" to settle Mary Ann Fisher's claim for Underinsured Motorist (UIM) coverage.

174.    These sums were grossly disproportionate to the harm and loss suffered by Rose and Mary Ann Fisher.

175.     Dr. Richard Bowman generated a life care plan for Rose Fisher.  The total cost of the life care plan was Four-Million Four-Hundred Sixty-Five Thousand Five-Hundred Forty-Five and 84/100 Dollars ($4,465,545.84).

176.     Dr. Richard Bowman generated a life care plan for Mary Ann Fisher. The total cost of the life care plan was One-Million Five-Hundred Fifty-Six Thousand Six-Hundred Three 92/100 Dollars ($1,556,603.92).

177.  Ultimately, Allstate tendered the available policy limits of One Hundred Thousand Dollars ($100,000) to each plaintiff and/or the available policy limits applicable under the policy.

178.     The claims conduct and handling described herein constitutes a general business practice of unfair claim settlement practices.

179.     Allstate's business practice and course of conduct involving multiple violations of West Virginia statutory law and West Virginia Insurance Regulations.

180.     Allstate, by and through its agents, adjusters, attorneys, and employees violated the West Virginia Unfair Trade Practices Act, and West Virginia Insurance Regulations with such frequency as to indicate a general business practice, specifically including, failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, failing in good faith to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear, failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies, refusing to pay claims without

conducting a reasonable investigation based upon all available information, compelling an insured person under an insurance policy to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amount ultimately recovered in actions brought by such insured, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered, failing to negotiate in good faith, and other violations of the West Virginia Unfair Trade Practices Act and Insurance Regulations.

181. Following the subject loss, the plaintiff made a claim under her applicable Allstate insurance policy and with the liability carrier (Allstate).

182. Defendant Allstate was provided adequate information to value the plaintiffs' claims for underinsured motorist coverage under the subject policy.

183. Despite the foregoing, Allstate repeatedly advised the plaintiff that it valued her claim at zero dollars ($0) for many years.

184. Allstate, by and through its agents, employees, adjusters, claims personnel and management have engaged in a pattern of unfair claim settlement practices as a direct and proximate result of their corporate business model described hereinabove and have engaged in insurance bad faith and unfair trade practices prohibited by West Virginia law.

## COUNT I

### Breach of Contract

185. The plaintiffs incorporate all paragraphs stated hereinabove by reference as if fully restated herein verbatim.

34

186.    The plaintiffs paid Allstate policy premiums in consideration for underinsured motorist coverage.

187.     Allstate in consideration for said premium did issue to the plaintiffs a policy of insurance.

188.    The parties to this suit have a contract for insurance which provided coverage to the plaintiffs at the time of the subject automobile crash.

189.    The plaintiffs suffered a covered loss under the subject insurance contract.

190.    The plaintiffs have complied with all terms and conditions of the insurance contract.

191.    Allstate failed and/or refused to provide the insurance coverage that it contracted for with the plaintiffs and is in breach of the subject insurance contract.

192.    Plaintiff's injuries, damages and losses under the applicable policy of insurance far exceed the limits of the tortfeasor's insurance policy.

193.    The defendant's breach of the covenant of good faith and fair dealing and/or breach of contract caused the plaintiffs significant injury and damages

194.    Damages caused by said breach of contract and/or breach of the covenant of good faith and fair dealing include, but are not necessarily limited to loss of insurance policy proceeds under the subject policy, economic loss, attorney's fees, litigation costs, annoyance, inconvenience, and other consequential losses for which the plaintiffs should be compensated.

## COUNT II

## Violation of the UTPA and Common Law Bad Faith

195.     The plaintiffs incorporate all paragraphs stated hereinabove by reference as if fully restated herein verbatim.

196.     Allstate engaged in unfair claim settlement practices in violation of West Virginia Code § 33-11-4(a) in at least the following particulars:

a. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

b. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

c. Refusing to pay claims without conducting a reasonable investigation based upon all available information;

d. Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

e. Compelling insureds to institute litigation to recover amounts due on an insurance policy by failing to make any offer of settlement for many years of litigation;

f.  Failing to promptly settle claims, where liability has become clear requiring the plaintiffs to file suit to collect monies due to them pursuant to the insurance policy; and/or

g.  Other violations hereinafter discovered.

197.     The acts and omissions of Allstate violated various provisions of Title 114, of the Legislative Rules of the Insurance Commission of the State of West Virginia.

198.     In addition to the foregoing, the acts and/or omissions of Allstate in the handling of the plaintiffs' first-party claims were in breach of the covenant of

36

good faith and fair dealing and amount to common law bad faith against the plaintiff which entitles the plaintiff to *Hayseed* damages.

199.    The acts of Allstate as described above, were intentionally undertaken by it in a willful, wanton, and/or reckless manner.

200.    All of the acts and omissions of Allstate by and through its agents, representatives and employees, were committed with such frequency as to indicate a general business practice, where required by law.

201.    The acts and omissions of Allstate by and through its agents, representatives, and employees, in the handling of the claims of the plaintiff were intentional, willful, and outrageous in character, and were done in bad faith without regard to the rights of the plaintiffs.

202.    The acts and omissions of Allstate, by and through its agents, representatives, and employees, caused the plaintiffs to sustain severe emotional distress, mental anguish, inconvenience, annoyance, embarrassment, and other general damages.

203.    The acts and omissions of Allstate, by and through its agents, representatives, and employees, caused the plaintiff to incur substantial costs, expenses, economic losses, and attorney's fees.

204.    The actions of Allstate, in the handling of the plaintiff's claims were done willfully, maliciously, and with careless disregard for the rights of the plaintiff.

205.    The acts and omissions of Allstate by and through its agents, representatives, and employees, were so outrageous that the plaintiff is entitled

37

to recover punitive damages from the defendant in order to punish the defendant and to deter it, and other insurance companies, from engaging in similar conduct in the future.

## DAMAGES

206.     The plaintiffs incorporate all paragraphs stated hereinabove by reference as if fully restated herein verbatim.

207.     The acts and omissions of Allstate, by and through its agents, representatives, and employees, caused the plaintiffs to sustain severe emotional distress, mental anguish, inconvenience, annoyance, embarrassment, and other general damages.

208.     The acts and omissions of the Allstate, by and through its agents, representatives, and employees, caused the plaintiffs to incur substantial costs, expenses, economic losses, and attorney's fees.

209.     The actions of Allstate, in the handling of the plaintiffs' claims were done willfully, maliciously, and with careless disregard for the rights of the plaintiffs.

210.     The acts and omissions of Allstate, by and through its agents, representatives, and employees, were so outrageous that the plaintiffs are entitled to recover punitive damages from the defendant in order to punish the defendant and to deter it, and other insurance companies, from engaging in similar conduct in the future.

**WHEREFORE**, the plaintiffs, Mary Ann Fisher and Rose Fisher, hereby demand judgment against the defendant, Allstate Insurance Company, including, but not limited to, attorney's fees and costs, annoyance and inconvenience, interest, and other losses; plus compensatory damages and punitive damages against the defendants in an amount in excess of the jurisdictional threshold of this Court and in an amount sufficient to fully compensate the plaintiffs for their injuries and damages and punish and/or deter the defendant for its conduct, respectfully; and for such additional favorable relief as the Court deems just and appropriate.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES.**

Respectfully submitted,
**MARY ANN FISHER and**
**ROSE FISHER**, plaintiffs,

By: /s/ __George N. Sidiropolis_____
George N. Sidiropolis, Esq. (#10391)
**Flanigan Legal, PLLC**
1140 Main Street, 4th Floor
Wheeling, WV 26003
Phone: (304) 233-7766
george@flaniganlegal.com

Jordan M. Laird, Esq. (#12448)
**LAIRD LAW, PLLC**
2 22nd Street, Suite 202
Wheeling, WV 26003
Phone: (304) 551-2800
Email: jordan@laird-law.com

# SUMMONS

## COPY

FILED | 6/26/2024 2:02 PM
CC-02-2024-C-324
Berkeley County Circuit Clerk
Michelle R. Schoppert

Michelle R. Schoppert

### IN THE CIRCUIT COURT OF BERKELEY COUNTY, WEST VIRGINIA
### Rose V Fisher v. Allstate Insurance Company

Service Type:    Secretary of State - Certified - Including Copy Fee

NOTICE TO:    Allstate Insurance Company, 5098 WASHINGTON ST W STE 407, Charleston, WV 25313

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

George Sidiropolis, 1140 MAIN ST STE 4, , WHEELING, WV 26003

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

6/26/2024 12:34:31 PM
Date

/s/ Michelle R. Schoppert
Clerk

By: [signature]
Deputy Clerk
6-26-2024

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to

_____, a member of the individual's family who is above the age of sixteen (16) years and by

advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

_____          _____
Date                              Server's Signature

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $ _____
☐ Return Receipt (electronic)      $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required          $ _____
☐ Adult Signature Restricted Delivery $ _____

Postage
$

Total Postage and Fees
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

24C-324
6-26-2024
Postmark Here

ISS & MAILED TO Secretary of State For Service

(ALLSTATE INSURANCE COMPANY)

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

**Mac Warner**
**Secretary of State**
Bldg. 1, Suite 157-K
1900 Kanawha Blvd. East
Charleston, WV 25305-0770
Phone: 304-558-6000
Toll-free: 866-767-8683



# Invoice

| | |
|---|---|
| Date: | 07/09/2024 |
| Invoice #: | 620508 |

Bill to:
CLERK OF THE CIRCUIT COURT OF BERKELEY COUNTY
380 W SOUTH STREET
SUITE 2200
Martinsburg, WV 25401-3210

Reference #: 24-C-324
Defendant name: ALLSTATE INSURANCE
COMPANY
County: BERKELEY

## Invoice summary

| Service | Service # | Qty | Unit Cost | Subtotal | Description |
|---|---|---|---|---|---|
| Service - US defendant | 15 | 1 | $20.00 | $20.00 | Filing fee for case #24-C-324 |

**Remaining balance (pay this amount):** **$20.00**

## Payment methods

**Payment is due at time of service.**
Accepted payment methods are check, credit card, or Intergovernmental Transfer (IGT).

## Intergovernmental transfer

State agencies using IGT: please follow the WVOASIS allocation instructions below for each billed item:
**Make sure to specify INVOICE ID #620508.**

| Service Id | OASIS Account #<br>Fund \| Dept \| Unit \| Rev \|Function | Invoice Id | | Amount |
|---|---|---|---|---|
| 15 | 0155-1600-1003-5592-5712 | 620508 | | $10.00 |
| | 1612-1600-1003-6696-5712 | 620508 | | $10.00 |

*Paid in June's Month End Closing*

*JM 7-11-24*

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits. 24C-324

1. Article Addressed to:

WV Secretary of State Process Division
WV One Stop Business Center
13 Kanawha Blvd. West, Suite: 201
Charleston, WV 25302

9590 9402 8541 3186 0097 95

2. Article Number (Transfer from service label)
9589 0710 5270 0384 1925 65

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X K. Bryant
☐ Agent
☐ Addressee

B. Received by (Printed Name)  K Bryant
C. Date of Delivery  7/8/24

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☑ No

BC CIRCUIT CLERK, WV
2024 JUL 11 AM 11:19

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery (00)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☑ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt